## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Ritchie Capital Management, L.L.C.;
Ritchie Capital Management, Ltd.;
Ritchie Special Credit Investments,
Ltd.; Rhone Holdings II. Ltd.; Yorkville
Investments I, LLC; and Ritchie Capital
Structure Arbitrage Trading, Ltd.,

              Plaintiffs,

              **MEMORANDUM OPINION**
              **AND ORDER**
    v.              Civil No. 15-1876 ADM/JJK

BMO Harris Bank, N.A., as successor to
M&I Marshall & Ilsley Bank,

              Defendant.

_____

Nancy Gertner, Esq., Law Offices of Nancy Gertner, Brookline, MA; Gregg M. Fishbein, Esq., and Kate M. Baxter-Kauf, Esq., Lockridge Grindal Nauen PLLP, Minneapolis, MN; and James T. Kim, Esq., Leo V. Leyva, Esq., Jed. M. Weiss, Esq., and Victoria J. Cioppettini, Esq., Cole Schotz P.C., Hackensack, NJ on behalf of Plaintiffs.

Joshua D. Yount, Esq., Lucia Nale, Esq., and Debra L. Bogo-Ernst, Esq., Mayer Brown LLP, Chicago, IL; Keith Moheban, Esq., and Adine S. Momoh, Esq., Stinson Leonard Street LLP, Minneapolis, MN; and John L. Kirtley, Esq., Godfrey & Kahn, S.C., Milwaukee, WI on behalf of Defendant.

_____

## I.  INTRODUCTION

    This matter is before the undersigned United States District Judge on Defendant BMO

Harris Bank, N.A.'s ("BMO") Motion to Dismiss [Docket No. 63] and Plaintiffs Ritchie Capital

Management, L.L.C.; Ritchie Capital Management, Ltd.; Ritchie Special Credit Investments,

Ltd.; Rhone Holdings II. Ltd.; Yorkville Investments I, LLC; and Ritchie Capital Structure

Arbitrage Trading, Ltd.'s (collectively, "Ritchie") Motion for Leave to Amend the Complaint

[Docket No. 90].  Oral argument on BMO's Motion to Dismiss was held on October 30, 2015,

and oral argument on Ritchie's Motion for Leave to Amend was held on January 29, 2016.  For

the reasons set forth below, the Motion to Dismiss is granted and the Motion for Leave to

Amend is denied.

## II.  BACKGROUND

This case stems from a $3.8 billion dollar Ponzi scheme orchestrated by Thomas J.

Petters through his company Petters Company, Inc. ("PCI").  The Ritchie entities as well as other

investors suffered large monetary losses when the scheme collapsed.  This case is one of at least

nine lawsuits that Ritchie has filed against third parties alleging liability for its losses.[1]

In the proposed First Amended Complaint ("FAC"), Ritchie alleges that M&I Marshall &

Ilsley Bank ("M&I")—the site of PCI's checking account—and M&I officer Christopher Flynn

(collectively, "Defendants") discovered no later than in 2005 that Petters was conducting a

massive Ponzi scheme.  Despite knowledge of the scheme, it is alleged Defendants chose to

---

[1] Ritchie's other actions, most which have been dismissed or stayed, include:  Ritchie Capital Mgmt., L.L.C. v. Costco Wholesale Corp., No. 14-4819 (S.D.N.Y. Sept. 21, 2015) (dismissed for lack of personal jurisdiction); Ritchie Capital Mgmt., L.L.C. v. U.S. Bank, N.A., No. 15-2092, 2015 WL 4744528 (D. Minn. Aug. 11, 2015) (dismissed based on statute of limitations and failure to state a claim); Ritchie Capital Mgmt., L.L.C. v. Gen. Elec. Capital Corp., No. 14-8623 (S.D.N.Y.) (dismissed for failure to state claim); Ritchie Capital Mgmt., L.L.C. v. Fredrickson & Byron, P.A., No. 1-14-2067, 2015 WL 1445681 (Ill. Ct. App. Mar. 27, 2015) (affirming dismissal of complaint); Ritchie Capital Mgmt., L.L.C. v. Opportunity Fin., L.L.C., No. 27-13-17424, 2015 WL 787747 (Minn. Dist. Ct. Jan. 15, 2015) (holding complaint subject to automatic stay under Bankruptcy Code because claims alleged by Ritchie are derivative of claims alleged by PCI Bankruptcy Trustee); Ritchie Capital Mgmt., L.L.C. v. JPMorgan Chase & Co., No. 14-4786 (D. Minn. July 2, 2015) (referred to bankruptcy court based on "significant factual and legal overlap with the ongoing Petters-related bankruptcy proceedings"); Ritchie Capital Mgmt., L.L.C. v. Jeffries, 849 F. Supp. 2d 881 (D. Minn. 2012) (dismissing action against former officers of Petters' companies as duplicative of bankruptcy proceedings); Ritchie Capital Mgmt., L.L.C. v. Coleman, No. 12-270, 2012 WL 1901300, at *1 (D. Minn. May 25, 2012) (dismissing case against Petters' former colleagues and law firm as duplicative of bankruptcy proceedings).

assist Petters rather than report him to authorities because M&I earned substantial fees from the PCI Account.  See Kim Supp. Aff. [Docket No. 101] Ex. D (FAC) (filed under seal).

Ritchie asserts civil conspiracy and fraud claims.  BMO, as successor-in-interest to M&I, moves to dismiss Ritchie's original Complaint.  BMO argues that dismissal is warranted on two grounds:  (1) the Complaint fails to state a claim for relief, requiring dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure; and (2) this case is duplicative of Petters-related bankruptcy proceedings and should be dismissed based on abstention.  BMO also opposes Ritchie's motion for leave to amend the Complaint, arguing that leave to amend should be denied based on prejudicial delay and futility.

**A.  Parties**

The Ritchie entities invest in securities of for-profit corporations.  FAC ¶¶ 9–12.  From February through May 2008, Ritchie made a series of loans totaling $189 million to Petters, PCI, and Petters Group Worldwide, LLC ("PGW").  Id. ¶¶ 13, 57, 60.

M&I was a Wisconsin banking corporation that maintained an office in Minneapolis, Minnesota.  Id. ¶ 14.  BMO is the successor-in-interest to M&I.  Id.

Christopher Flynn was employed by M&I as a senior bank officer and member of management who handled large commercial accounts.  Id. ¶ 15.  Beginning in 2007, Flynn had primary day-to-day responsibility for the PCI checking account at M&I (the "PCI Account").  Id. ¶ 45.

**B.  Petters' Scheme**

Petters' fraud was centered on, but not limited to, a fictional "purchase order financing" scheme.  Id. ¶ 19.  As part of the scheme, Petters borrowed money from lenders to purportedly

finance "purchase order financing" transactions.  Id.  Petters represented that PCI and some of its affiliates were in the business of purchasing and selling goods to discount wholesalers, including Costco, Sam's Club, and B.J.'s Wholesale Club (collectively, the "Retailers").  Id. ¶ 20.  The financing provided by lenders was purportedly used to purchase goods from Petters' suppliers, which were then sold to Retailers for a profit.  Id.

PCI controlled and operated special purpose entities ("SPEs") that received the loan funds from investors.  Id. ¶ 21.  The SPEs supposedly forwarded the funds to the vendors of the goods, which included Nationwide International Resources ("Nationwide") and Enchanted Family Buying Company ("Enchanted") (collectively, the "Suppliers").  Id.  However, instead of purchasing goods, the Suppliers, in cooperation with Petters and his conspirators, fraudulently rerouted the funds back to PCI after deducting a commission.  Id.  Those funds were then transferred to other entities controlled by PCI and Petters through bank accounts maintained at M&I.  Id.  The financial and banking records of PCI and the SPEs confirm that the Retailers did not purchase any goods from them.  Id.

From 1995 until his arrest in October 2008, Petters laundered more than $40 billion in proceeds from the Ponzi scheme.  Id. ¶¶ 19, 23.  The scheme resulted in losses of over $3 billion for lenders and investors.  Id. ¶ 23.

## C.  Ritchie's Loans to Petters

Although Ritchie made 14 loans totaling $189 million to Petters, PCI, and PGW from February through May 2008, only two of those loans were made as part of Petters' purchase

order financing scheme.[2]  Id. ¶¶ 6, 60.  Those loans, made on March 21, 2008 in the total amount

of $31 million, were provided by plaintiffs Ritchie Capital Management, Ltd. and Ritchie

Special Credit Investments, Ltd. (collectively, the "March Lenders") ostensibly to fund the

purchase of 232,500 Sony PlayStation video game consoles (the "PlayStation Transaction").  Id.

Petters told the March Lenders that PCI would resell the PlayStation consoles to an intermediary

that would, in turn, sell them to Costco.  Id.  As was later discovered, Petters solicited the loans

to pay off other investors in furtherance of the Ponzi scheme.  Id. ¶ 6.

On or about March 19 and 20, the March Lenders, M&I, and other potential investors

participated in two conference calls to discuss the structure of the proposed PlayStation

Transaction and the establishment of deposit control agreements.  Id. ¶¶ 7, 61.  Flynn represented

that under the proposed deposit control agreement with Ritchie (the "Ritchie Deposit Control

Agreement"), M&I would establish a special account with Ritchie to collect payments to be sent

directly from Costco (the "Ritchie Deposit Account").  Id. ¶ 62.  The March Lenders informed

Flynn that they would not lend the $31 million to PCI unless M&I agreed to assume these

functions.  Id. ¶ 63.  Through these negotiations, Defendants affirmed that the March Lenders'

loans, as well as the loans of other lenders who were entering into deposit control agreements

with Petters and M&I, were being repaid from the sale of consumer merchandise to Retailers.

Id. ¶¶ 7, 50, 52–55, 71.  However, as explained below, it is alleged M&I knew that the Ritchie

Deposit Control Agreement and the other deposit control agreements were a sham, because at the

---

[2] Ritchie has alleged in other Petters-related litigation that the purposes of the other loans included enabling Polaroid Corporation (also owned by Petters) to repay an existing loan, and providing PGW with working capital.  See Ritchie Capital Mgmt., L.L.C. v. Jeffries, 849 F. Supp. 2d 881, 883–84 (D. Minn. 2012).

time these agreements and the loans for the PlayStation Transaction were being negotiated M&I knew that the purchase order financing transactions were fictitious and that there would be no proceeds from any such transaction.

**D.  M&I's Alleged Knowledge of and Complicity in Petters' Fraud**

Ritchie alleges that as early as 2005, M&I became aware of Petters' fraud when it learned that there were no deposits into the PCI Account from a Retailer, that most of the transfers into the PCI Account were made by Suppliers, and that funds from the PCI Account were being wired from one investor to another.  Id. ¶¶ 37, 40, 44, 77–79.  M&I knew that this pattern of the flow of funds to and from the PCI Account was inconsistent with Petters' stated business model. Id. ¶¶ 44, 77.  M&I also knew that the $35.3 billion deposited into the PCI Account from January 1, 2003 through August 31, 2008 vastly exceeded PCI's stated annual revenues of $1.3 billion. Id. ¶ 42.  Based on this knowledge, M&I was aware that Petters was lying about his business and was actually operating a Ponzi scheme.  Id. ¶ 77.

Nevertheless, instead of discontinuing its relationship with Petters and reporting him to authorities, M&I allegedly provided substantial assistance to the Ponzi scheme by:  effectuating tens of billions of wire transfers from the phony Suppliers to the PCI Account and between lenders; transferring Ritchie's loans from the PCI Account to third party lenders; negotiating and establishing the sham Ritchie Deposit Account; and falsely assuring the March Lenders that their loans would be used to purchase consumer goods and would be repaid through the sale of those goods.  Id. ¶¶ 76–98.

Based on these allegations, Ritchie asserts claims against M&I for aiding and abetting fraud and for civil conspiracy (Counts I and II), and a claim against both Defendants for

fraudulent misrepresentation and inducement (Count III).  Id. ¶¶ 73–99.

**E.  Bankruptcy Proceedings**

**1.  PCI Bankruptcy**

Following the collapse of the Ponzi scheme, several of Petters' entities, including PCI, PGW, and Polaroid Corporation, filed for bankruptcy protection in Minnesota.  See, e.g., In re Petters Co., Inc., No. 08-45257 (Bankr. D. Minn. Oct. 11, 2008) (the "PCI Bankruptcy"); In re Polaroid Corp., No. 08-46617 (Bankr. D. Minn. Dec. 18, 2008); In re Petters Capital, LLC, No. 09-43847 (Bankr. D. Minn. June 12, 2009).  These bankruptcy cases remain pending.  In the PCI Bankruptcy, Chapter 11 plan confirmation proceedings are actively progressing, with an Amended Disclosure Statement having been approved by the bankruptcy court on February 25, 2016 and a confirmation hearing on the Modified Chapter 11 Liquidation Plan scheduled for April 12, 2016.  See PCI Bankruptcy [Docket No. 3142].

**a.  Ritchie's Proofs of Claim, PCI Trustee's Adversary Proceeding**

The Ritchie entities have filed proofs of claim exceeding $209 million in the PCI Bankruptcy.  The proofs of claim seek recovery under the promissory notes Ritchie received in connection with their Petters-related investments, including the two loans for the March 2008 PlayStation Transaction.  See PCI Bankruptcy, Claim Nos. 96-1, 97-1, 98-1, 100-1.  Ritchie's proofs of claim also assert contract, tort, and statutory claims against PCI, including claims for fraud and conspiracy to commit fraud based on misrepresentations and omissions about the nature of PCI's business and the use of funds obtained from Ritchie.  Id.

The PCI Trustee has filed an adversary proceeding against Ritchie, seeking to disallow all of Ritchie's proofs of claim.  See Kelley v. Ritchie Capital Mgmt., L.L.C., Adv. No. 10–4440

(Bankr. D. Minn.) (the "Ritchie Adversary Proceeding") Compl. [Docket No. 1] ¶¶ 137–162.

The PCI Trustee alleges that Ritchie's "investments were made and maturities were extended

notwithstanding the fact that [Ritchie] was on actual notice of various indicia of fraud and

financial irregularity." Id. ¶ 52.

The Ritchie Adversary Proceeding is one of more than 200 avoidance actions that have

been filed by the PCI Trustee in the PCI Bankruptcy case.  Through the adversary proceedings,

the PCI Trustee seeks to disallow certain claims, avoid certain liens, and recover preferential and

fraudulent transfers of PCI's property that were made prior to filing for bankruptcy.  See PCI

Bankruptcy, Am. Disclosure Statement [Docket No. 3131] at 4.  The avoidance actions are

proceeding on a common litigation track established by the bankruptcy court's Case

Management Procedures Governing Multiple Adversary Proceedings.  See, e.g., PCI Bankruptcy

[Docket Nos. 961, 1284, 2172].  Although settlements have been reached in many of the

adversary proceedings, more than 70 remain pending, including the Ritchie Adversary

Proceeding.

**b.  PCI Trustee's Adversary Proceeding Against BMO**

One of the many avoidance actions by the PCI Trustee is an adversary proceeding against

BMO that was filed on November 14, 2012.  See Kelley v. BMO Harris Bank N.A., Adv. No.

12–4288 (Bankr. D. Minn.) (the "BMO Adversary Proceeding").  Similar to Ritchie's claims in

this case, the BMO Adversary Proceeding alleges claims for aiding and abetting fraud, aiding

and abetting breach of fiduciary duty, and conspiracy to commit fraud.

Mirroring Ritchie's claims here, the PCI Trustee's claims against BMO assert M&I's

alleged knowledge of Petters' Ponzi scheme and its alleged assistance in the scheme.  Id.  The

PCI Trustee alleges that from 1999 until the FBI raided Petters' corporate offices in September 2008, over $40 billion flowed into and out of the PCI account at M&I.  The PCI Trustee further contends that M&I was familiar with the business model that Petters was portraying to PCI's lenders and was also aware that money coming into the PCI account did not come from Retailers as represented by Petters to lenders.  Despite this knowledge, M&I allegedly assisted Petters in perpetuating the fraud by allowing him to utilize the PCI Account at M&I to transfer funds.  The PCI Trustee also alleges that in 2008, M&I entered into several deposit control agreements with PCI and Petters' lenders, including the Ritchie Deposit Control Agreement, to ensure that retailer payments flowed to the appropriate lender's account.  Despite entering into those agreements, the flow of funds did not change in any way.

BMO disputes the PCI Trustee's claims and has filed a motion to dismiss the Complaint in the BMO Adversary Proceeding.  The PCI Trustee intends to seek leave to amend the Complaint.  BMO is anticipated to oppose any motion to amend.  See PCI Bankruptcy, Am. Disclosure Statement at 36.

## 2. Palm Beach Bankruptcy

In addition to the Petters-related bankruptcy cases in Minnesota, two Florida-based investment funds that had invested heavily in the Petters Ponzi scheme—Palm Beach Finance Partners, L.P. and Palm Beach Finance II, L.P. (the "Palm Beach Funds")—filed for bankruptcy in the Southern District of Florida in November 2009.  See In re Palm Beach Fin. Partners, L.P., No. 09-36379 (Bankr. S.D. Fla.) ("Palm Beach Bankruptcy"); In re Palm Beach Fin. II, LP, No. 09-36396 (Bankr. S.D. Fla.).  A Chapter 11 bankruptcy joint plan of liquidation was confirmed by the Florida bankruptcy court in October 2010, and a liquidating trustee (the "Palm Beach

Trustee") was appointed.  See Palm Beach Bankruptcy [Docket No. 444].

In November 2011, the Palm Beach Trustee filed a bankruptcy adversary proceeding against BMO and Flynn, asserting fraudulent transfer claims under Florida law and federal bankruptcy law, as well as tort claims for aiding and abetting fraud, fraudulent inducement and misrepresentation, conspiracy to commit fraud, gross negligence, and breach of fiduciary duty. Mukamal v. BMO Harris Bank N.A., No. 11-3015 (Bankr. S.D. Fla.) ("Palm Beach I") [Docket No. 1].  Similar to the claims here and in the BMO Adversary Proceeding, the Palm Beach Trustee's tort claims were based on allegations of M&I's knowledge of the fraudulent scheme of Petters purchase financing transactions utilizing the M&I account.  M&I allegedly assisted in the fraud by, among other things, entering into a deposit control agreement with PCI and the Palm Beach entities that falsely assured the Palm Beach entities that funds from retailers would be deposited into an account at M&I that had been established for them.  See In re Palm Beach Fin. Partners, L.P., 488 B.R. 758, 765 (Bankr. S. D. Fla. 2013).

On February 26, 2013, the Florida bankruptcy court dismissed the Palm Beach Trustee's tort claims against BMO and Flynn.  See id. at 771–82.  With respect to the claim for aiding and abetting fraud, the Florida bankruptcy court found that the requisite level of knowledge had not been sufficiently alleged because the allegations in the First Amended Complaint did not "indicate that anyone at M&I had actual knowledge of Petters' fraud.  Instead, they merely suggest that M&I should have known of Petters' fraud had they been paying closer attention and looked into some of the 'suspicious' transactions."  Id. at 773.  Moreover, "M&I had no duty to investigate its customer's banking activities and thus, did not have 'means of knowledge'" of Petters' fraud.  Id. at 774.  The fraud and conspiracy claims were dismissed because, among

other things, they were not pled with the requisite specificity.  Id. at 774–78.

Although the Palm Beach Trustee's tort claims were dismissed, the fraudulent transfer claims were allowed to proceed, and discovery was conducted on those claims.  In May 2013, BMO produced documents evidencing that from 2005 until the collapse of the Petters fraud in the fall of 2008, the PCI Account repeatedly triggered a computerized anti-money laundering alert system that M&I had installed in 2005 (the "AML Alerts").  See Palm Beach I [Docket No. 132] (Mot. Compel) at 3.  Based on this discovery, the Palm Beach Trustee filed a sealed motion in June 2014 for leave to file a Second Amended Complaint to reassert the tort claims against BMO that previously had been dismissed.  See Fishbein Letter [Docket No. 82] Ex. D (Palm Beach Bankruptcy Hr'g Tr., Aug. 25, 2015) at 7:1–4; Palm Beach I [Docket No. 226] (Agreed Order).  Following an in camera hearing, the Florida bankruptcy court granted the motion and issued a publicly filed Order stating that the Second Amended Complaint, which remained under seal, was deemed filed.  See Palm Beach I [Docket No. 252] (Order Granting Pl.'s Mot. Leave File Second Am. Compl.); Palm Beach I [Docket No. 238] Ex. 2 (Second Am. Compl.) (sealed).

In September 2014, the Palm Beach Trustee filed a second adversary proceeding against BMO alleging additional fraudulent transfer claims.  See Mukamal v. BMO Harris Bank N.A., No. 14-1660 (Bankr. S.D. Fla.)  ("Palm Beach II") [Docket No. 1].  The Complaint in Palm Beach II was not filed under seal.  See id.  The publicly-filed Palm Beach II Complaint includes allegations that the PCI Account had triggered AML alerts at M&I from 2005–2008 and that the AML alerts prompted M&I to investigate the amount and source of PCI's incoming and outgoing wires during that time period.  See id. ¶¶ 56–67.

On July 16, 2015, the Palm Beach Trustee publicly filed a motion to approve a $16

million settlement with BMO that resolved <u>Palm Beach I</u> and <u>Palm Beach II</u>.  <u>See</u> Palm Beach

Bankruptcy [Docket No. 2670].  The Florida bankruptcy court entered an order approving the

settlement on August 25, 2015.  <u>See</u> Palm Beach Bankruptcy [Docket No. 2689].

## F.  Procedural Posture

Ritchie originally filed this lawsuit against BMO on February 4, 2014 in the State of New

York, New York County.  In the Complaint, Ritchie alleged M&I, with knowledge of Petters'

fraud, assisted in perpetuating the fraud by:  (1) executing daily wire transfers for tens of

millions of dollars that were inconsistent with Petters' business model and consistent with a

Ponzi scheme; (2) negotiating and entering into deposit control agreements with Ritchie and

other lenders that provided false legitimacy to Petters' operations and lured Ritchie into

investing; and (3) effectuating transfers of funds that were inconsistent with the deposit control

agreements.  Notice of Removal [Docket No. 2] Ex. A (Compl.) ¶¶ 2–6, 21–96.  The New York

Complaint asserted claims against BMO only and did not name Flynn as a Defendant.  <u>See</u>

<u>generally id</u>.  The suit at that time did not include allegations about the AML alerts that were

triggered by the PCI Account and investigated by M&I.  <u>Id.</u>

BMO removed the action to the United Stated District Court for the Southern District of

New York.  In March 2015, the New York federal district court denied a motion by Ritchie to

remand and granted a motion by BMO to transfer the case to this district.  <u>See</u> <u>Ritchie Capital</u>

<u>Mgmt., L.L.C. v. BMO Harris Bank</u>, N.A., No. 14–1936, 2015 WL 1433320 (S.D.N.Y. March

30, 2015).  In denying Ritchie's motion to remand, the New York court concluded that federal

subject matter jurisdiction exists for this action under 28 U.S.C. § 1334(b) because this case is

"related to" the PCI Bankruptcy proceedings.[3]  <u>Id.</u> at *5.  In so holding, the court observed that "the PCI Trustee's causes of action against BMO Harris—aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and civil conspiracy—are nearly identical to those brought here, and are premised, at least in part, on the very same conduct."  <u>Id.</u>

In June 2015, Ritchie and BMO stipulated to a briefing schedule under which BMO would be required to file an answer or a motion directed to the Complaint by August 10, 2015.  <u>See</u> Stipulation [Docket No. 57].  In July 2015, the Palm Beach Trustee's $16 million settlement with BMO was publicly filed.  At that time, Ritchie did not request an extension to the briefing schedule or seek to investigate the sealed documents underlying the settlement agreement in the Palm Beach actions.

On August 10, 2015, BMO filed the instant Motion to Dismiss.  Ritchie filed an opposition brief [Docket No. 72] in September 2015.  The opposition brief made no mention of the sealed <u>Palm Beach I</u> pleadings and did not seek leave to amend the Complaint.  On October 19, 2015, after BMO had submitted a reply memorandum and the Motion to Dismiss had been fully briefed, Ritchie submitted a letter [Docket No. 74] requesting that the October 30, 2015 hearing on the Motion to Dismiss be postponed while Ritchie pursued efforts to unseal the Second Amended Complaint underlying the publicly-filed July 2015 settlement in <u>Palm Beach I</u>. The Court denied the request, held oral argument as scheduled, and took the Motion to Dismiss under advisement.

On November 7, 2015, Ritchie moved to intervene in <u>Palm Beach I</u> for the purpose of

---

[3] 28 U.S.C. § 1334(b) provides in relevant part:  "[T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under [the Bankruptcy Code], or arising in or related to cases under [the Bankruptcy Code]."

unsealing the Second Amended Complaint and related pleadings.  Fishbein Letter at 1, Ex. A.

On November 24, 2015, BMO agreed to provide Ritchie with the sealed Second Amended

Complaint in <u>Palm Beach I</u>.  On December 4, 2015, while the Motion to Dismiss remained under

advisement, Ritchie filed its Motion for Leave to Amend.  Ritchie's Memorandum in Support of

the Motion for Leave to Amend [Docket No. 95] was filed under seal on December 21, 2015,

and a complete version of the proposed First Amended Complaint ("FAC") that included all

exhibits was filed on December 22, 2015.

Unlike the original Complaint, the FAC includes a claim against Flynn for "fraud and

misrepresentation and fraudulent inducement."  FAC ¶¶ 90–98.  The FAC also includes

allegations that the PCI Account repeatedly triggered AML Alerts from 2005 to 2008, and that

the Alerts prompted M&I to investigate the amount and source of all incoming and outgoing

transfers for the PCI Account during that time period.  FAC ¶¶ 34–38, 76–79.  Based on the

money laundering investigations, M&I allegedly learned that no Retailer had made a payment

into the PCI Account and that PCI was repaying investors with loans made by other investors.

<u>Id.</u> ¶¶ 39, 79–80.

Similar to the original Complaint, the FAC alleges that despite knowing that the

purported retailer transactions had not occurred, M&I assisted in and agreed to perpetuate

Petters' fraud by:  failing to report Petters and discontinue its relationship with him; processing

tens of billions of dollars in wire transfers to the PCI Account; effectuating transfers between

lenders that were inconsistent with Petters' business model; participating in negotiations with the

March Lenders about the Ritchie Deposit Agreement and entering into that Agreement; falsely

assuring the March Lenders that Petters conducted legitimate transactions with his Suppliers and

Retailers; and falsely representing to the March Lenders that their loans related to the

PlayStation Transaction would be used to purchase consumer goods and would be repaid from

the sale of those goods to Retailers.  Id. ¶¶ 81, 88.

## III.  DISCUSSION

### A.      Motion for Leave to Amend

Federal Rule of Civil Procedure 15(a) provides that if more than 21 days has passed since

the service of a Rule 12(b) motion, "a party may amend its pleading only with the opposing

party's written consent or the court's leave.  The court should freely give leave when justice so

requires." Fed. R. Civ. P. 15(a)(1)–(2).  Under the liberal amendment policy of Rule 15(a),

"denial of leave to amend pleadings is appropriate only in those limited circumstances in which

undue delay, bad faith on the part of the moving [party], futility of the amendment, or unfair

prejudice to the non-moving party can be demonstrated."  Roberson v. Hayti Police Dept., 241

F.3d 992, 995 (8th Cir. 2001).

Ritchie argues leave to amend should be granted because the case remains at the pleading

stage and it sought leave to amend immediately after obtaining the sealed documents.  Ritchie

thus contends it was acting in good faith, has caused no undue delay, and there is no unfair

prejudice to BMO.  Further, Ritchie argues that leave to amend would not be futile.

BMO responds that Ritchie unduly delayed its effort to amend and that the delay has

resulted in prejudice to BMO.  Additionally, BMO argues that leave to amend should be denied

as futile because (1) the FAC fails to state a claim for relief, and (2) the FAC's duplication of

bankruptcy matters warrants dismissal on abstention grounds.

**1. Delay**

"[D]elay alone is insufficient to deny a motion for leave to amend." <u>Dennis v. Dillard Dep't Stores, Inc.</u>, 207 F.3d 523, 525 (8th Cir. 2000).  "Rather, the party opposing the motion must show it will be unfairly prejudiced." <u>Id.</u>  Additionally, "even where some prejudice to the adverse party would result if the motion to amend were granted, the prejudice must be balanced against the hardship to the moving party if it is denied." <u>Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 644 F.2d 690, 694 (8th Cir. 1981) (finding district court erred in denying plaintiffs leave to amend where no significant prejudice resulted from the two and one-half year delay between the filing of the complaint and plaintiffs' request for leave to amend).

BMO argues that Ritchie's delay in seeking leave to amend is unjustified because Ritchie could have developed the recently added allegations long ago.  For example, information about the AML Alerts was made public as early as July 2013 in <u>Palm Beach I</u>, when the Palm Beach Trustee referenced the AML Alerts in a publicly filed motion to compel discovery.  <u>See</u> <u>Palm Beach I</u> [Docket No. 132] at 2–5.  Information about the AML Alerts was also made publicly available through the unsealed Complaint filed in <u>Palm Beach II</u> in September 2014.  <u>See</u> <u>Palm Beach II</u> [Docket No. 1] ¶¶ 56–64.  Additionally, the $16 million settlement in the Palm Beach cases was publicly filed in July 2015.

It was not until October 2015, after both parties had fully briefed the Motion to Dismiss, that Ritchie made its attempt to obtain the sealed <u>Palm Beach II</u> Second Amended Complaint.  BMO insists it is prejudiced by this unnecessary delay because BMO will be required to repeat its costly motion to dismiss efforts if Ritchie is now allowed to belatedly amend the Complaint.  BMO also argues the delay will make discovery on Ritchie's new and expanded claims more

difficult.

Although Ritchie offers no explanation justifying its delay in seeking leave to amend, the delay is not unduly prejudicial to BMO.  This case was not transferred to this district until March 2015.  Prior to that time, the litigation was focused on the parties' remand and transfer motions. Ritchie's delay itself in not seeking leave to amend at an earlier date did not result in prejudicial delay to BMO.

BMO further argues that the proposed amended pleading is prejudicial because the FAC has greatly expanded the scope of the litigation to include all $189 million in loans made by Ritchie rather than just the $31 million to finance the PlayStation Transaction.  However, the original Complaint placed all of Ritchie's loans at issue by alleging that "M&I actively joined in [Petters'] conspiracy and assisted Petters in receiving the funds advanced by [Ritchie] . . . in February, March and May of 2008, and immediately transferring those funds to unauthorized recipients and Petters' cohorts."  Compl. ¶ 6.

Based on the early procedural stage of this litigation, the relatively short length of delay, and the liberal amendment standard articulated in Rule 15(a), leave to amend will not be denied on the basis of undue delay.  Therefore, the Court will proceed to analyze whether leave to amend should be denied based on futility.

## 2.  Futility

BMO contends that the FAC is futile because it fails to state plausible claims for relief and, alternatively, that its duplication of the Petters-related bankruptcy proceedings calls for abstention.  Because the Court agrees that the FAC is duplicative of the Petters-related bankruptcy proceedings, the abstention argument is addressed first.

### a. Abstention

Generally, federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." Co. River Water Conserv. Dist. v. United States, 424 U.S. 800, 817 (1976).  The Eighth Circuit, however, has articulated "a prudential limitation on the exercise of federal jurisdiction" based on duplicity in multiple federal proceedings.  Mo. ex rel. Nixon v. Prudential Health Care Plan, Inc., 259 F.3d 949, 953 (8th Cir. 2001).  "Although no precise rule has evolved with regard to the handling of instances where identical issues are raised in cases pending in different federal courts, the general principle is to avoid duplicative litigation." Brewer v. Swinson, 837 F.2d 802, 804 (8th Cir. 1988) (citing Co. River, 424 U.S. at 817).  When federal courts are simultaneously exercising jurisdiction over the same matter, one federal court may defer to another based on "considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.'"  Co. River, 424 U.S. at 817 (quoting Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co., 342 U.S. 180, 183 (1952)).

The threshold issue in evaluating whether to abstain because of concurrent federal litigation requires determining whether the proceedings are, in fact, duplicative.  Brewer, 837 F.2d at 804.  As stated by the Eighth Circuit, "the district court has the authority to refuse to hear [a] case if it raises issues that substantially duplicate those raised by a case pending in another court." Ritchie Capital Mgmt., L.L.C. v. Jeffries, 653 F.3d 755, 763 n.3. (8th Cir. 2011). Complete identity between parallel actions is not required.  Nat'l Indem. Co. v. Transatl. Reins. Co., 13 F. Supp. 3d 992, 998 (D. Neb. 2014).  Rather, "the crucial inquiry is one of 'substantial overlap' between the parties and issues being litigated." Id. (quoting Save Power Ltd. v. Syntek Fin. Corp., 121 F.3d 947, 950-51 (5th Cir. 1997)).

With the exception of Flynn, the parties and the issues being litigated in this case substantially overlap with those in the Peters-related bankruptcy proceedings.  As recognized by the New York federal court when transferring this case to Minnesota, "both the Trustee in the bankruptcy proceedings and the Ritchie plaintiffs seek damages from BMO Harris based on the same conduct. . . .  Moreover, the PCI Trustee's causes of action against BMO Harris—aiding and abetting fraud, aiding and abetting breach of fiduciary duty, and civil conspiracy—are nearly identical to those brought here [by Ritchie], and are premised, at least in part, on the very same conduct."  Ritchie, 2015 WL 1433320, at *5.

The PCI Trustee's Complaint in the BMO Adversary Proceeding and the FAC share the same core allegations, including:

- M&I knew that PCI was borrowing funds from investors purportedly to finance purchase order financing transactions.  PCI Trustee Compl. ¶ 26; FAC ¶ 28.

- In 2002, Flynn met with Frank Vennes, a Petters business associate and the president, CEO and sole shareholder of Metro Gem, Inc., a PCI investor.  During this meeting, Flynn learned how PCI's purported purchase order financing transactions were structured.  PCI Trustee Compl. ¶ 27; FAC ¶ 29.

- M&I knew that PCI never received any deposits from Retailers and that the majority of deposits into the PCI Account were made by Suppliers.  This flow of funds contradicted PCI's business model.  PCI Trustee Compl. ¶¶ 39–40; FAC ¶¶ 39–40.

- From January 1, 2003 through August 31, 2008, more than $35.3 billion was deposited into the PCI Account.  This amount vastly exceeded PCI's annual revenues of $1.3 billion.  PCI Trustee Compl. ¶¶ 40, 47; FAC ¶¶ 42, 44.

- Many of the outgoing wire transfers were made in large whole dollar amounts, which is indicative of money laundering.  PCI Trustee Compl. ¶ 93; FAC ¶ 43.

- M&I was motivated to assist in Petters' fraud because M&I earned substantial fees and profits from its relationship with Petters.  PCI Trustee Compl. ¶ 89; FAC ¶ 47.

- M&I entered into deposit control agreements with Petters and certain of Petters' lenders, including Ritchie, in which M&I agreed to provide the lenders with the proceeds of the

sales to Retailers.  The deposit control agreements falsely assured the lenders that their loans were being used to finance purchase order transactions and that they would be repaid with the proceeds of the sales to the Retailers.  M&I did not perform any of its obligations under the agreements.  PCI Trustee Compl. ¶¶ 54–94, Ex. J; FAC ¶¶ 50–56, 61–72, Ex. B.

Clearly the overlap of the claims by the PCI Trustee and Ritchie against BMO is substantial.

The overlapping claims against BMO will result in this Court and the bankruptcy court simultaneously deciding identical issues.  For example, Ritchie and the PCI Trustee's aiding and abetting claims will require both this Court and the bankruptcy court to consider whether M&I had knowledge of the Petters fraud and whether M&I's conduct constituted substantial assistance.  See E-Shops Corp. v. U.S. Bank Nat'l Ass'n, 795 F. Supp. 2d 874, 877 (D. Minn. 2011) (stating that elements of aiding and abetting fraud include:  the defendant knew that the primary actor's conduct constituted fraud; and the defendant substantially assisted or encouraged the primary actor's fraud).  Similarly, Ritchie and the PCI Trustee's civil conspiracy claims will require both this Court and the bankruptcy court to consider whether M&I reached a common understanding with Petters to defraud creditors.  See Scheele v. Union Loan & Fin. Co., 274 N.W. 673, 679 (Minn. 1937) (stating conspiracy is a "common understanding to commit [a] wrong").

In addition to the substantial overlap between this case and the BMO Adversary Proceeding, the present case also duplicates issues raised in the bankruptcy proceedings regarding Ritchie's proofs of claim and the Ritchie Adversary Proceeding.  Specifically, Ritchie's proofs of claim are based on the very same investments that Ritchie seeks to recover here, and thus Ritchie is seeking the same relief in both forums.  Additionally, the PCI Trustee in the Ritchie Adversary Proceeding seeks to disallow Ritchie's proofs of claim because, among

other things, Ritchie was allegedly "on actual notice of various indicia of fraud and irregularity" when it invested $189 million with Petters.  Ritchie Adversary proceeding [Docket No. 1] ¶ 52. Resolution of this allegation is necessary to:  (1) the bankruptcy court's disposition of Ritchie's proofs of claim in the PCI Bankruptcy; (2) the Ritchie Adversary Proceeding brought by the PCI Trustee; and (3) this Court's determination of whether M&I's alleged conduct proximately caused Ritchie's harm.

Thus, the three matters in the bankruptcy court will address nearly every issue raised here, from M&I's culpability in the Petters fraud to Ritchie's awareness of that fraud.  The proceedings in both forums rely on a common nucleus of operative fact—the circumstances surrounding Ritchie's transactions with Petters and M&I's role in those transactions, including M&I's processing of wire transactions for the PCI Account and its negotiation of and entry into the deposit control agreements, including the Ritchie Deposit Control Agreement.  The proceedings are also directed to the same recovery:  for Ritchie, recovery on its investments here and in the bankruptcy proceedings; for Ritchie and the PCI Trustee, a finding that BMO was complicit in Petters' fraud; and for BMO, a finding of no liability for its conduct related to the PCI Account and the Petters fraud.

Ritchie argues that this case is not duplicative of the bankruptcy proceedings because the parties are not identical and their interests are not aligned or related.  The Court disagrees. Although Ritchie and the PCI Trustee are not identical parties, they both seek to hold BMO liable for aiding and abetting fraud and for civil conspiracy to commit fraud based on substantially the same conduct.  Moreover, Ritchie is a claimed creditor of the PCI Bankruptcy estate for which the PCI Trustee seeks recovery from BMO.  Therefore, Ritchie and the

Trustee's interests are sufficiently aligned or related to cause the litigation to be duplicative for the purposes of abstention.  See Pace Constr. Co., Inc. v. Travelers Cas. & Sur. Co. of Am., 259 F. Supp. 2d 934, 937 (E.D. Mo. 2003) (finding parallel proceedings because interests of non-identical parties were aligned); Samuels Grp., Inc. v. Hatch Grading & Contracting, Inc., 697 F. Supp. 2d 1042, 1051 (N.D. Iowa 2010) (abstaining where interests of non-identical parties were related).

Additionally, although Flynn is not a party to the bankruptcy proceedings, the claims against him are untimely.  Ritchie's fraud claim against Flynn was not raised until the FAC was first filed on December 21, 2015.  The claim is based on Flynn's alleged representations to Ritchie in March 2008 that loans to PCI were used to purchase consumer goods and were repaid from the proceeds of sales to Retailers.  FAC ¶¶ 61–65, 91.  Minnesota law requires plaintiffs to bring fraud claims within six years of the date they discover, or with reasonable diligence ought to have discovered, "the facts constituting the fraud."  Minn. Stat. § 541.05, subd. 1(6).  "[I]n an action for fraud brought more than 6 years after the fraudulent acts relied upon, the plaintiff must allege in his complaint that he did not discover fraud until within 6 years before the commencement of the action."  Kelly v. Kelly, 229 N.W.2d 526, 530 (Minn. 1975).  The FAC does not include the required allegation that Ritchie did not discover Flynn's fraud until after December 21, 2009 (six years before Ritchie filed the FAC asserting the claim against Flynn).  Nor can Ritchie make such an allegation.  Ritchie would have discovered that Flynn's alleged statements were false in October 2008, when the Petters Ponzi scheme was uncovered and PCI entered bankruptcy.  Therefore, Ritchie would have had to assert the fraud claim by at least October 2014.  As a result, the claim against Flynn falls outside of the 6-year statute of

22

limitations.

Moreover, the fraud claim against Flynn does not relate back to the original Complaint. For a claim against a new defendant to relate back to the original pleading, Rule 15(c)(1)(C) requires that the party to be brought in by the amended pleading "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C)(ii). Ritchie does not argue that its failure to name Flynn in the original Complaint was due to a mistake concerning Flynn's identity. Indeed, it is clear from the original Complaint that no such mistake existed. The original Complaint made extensive allegations about Flynn's role in the alleged fraud and asserted that he was the M&I employee who allegedly knew about Petters' fraudulent scheme, yet the Complaint did not name Flynn as a defendant. Therefore, the requirements of Rule 15(c)(1)(C) are not satisfied here. See Krupski v. Costa Crociere S.p.A., 560 U.S. 538, 552 (2010) ("When the original complaint . . . compel[s] the conclusion that the failure to name the prospective defendant in the original complaint was the result of a fully informed decision as opposed to a mistake concerning the proper defendant's identity, the requirements of Rule 15(c)(1)(C)(ii) are not met."). With the elimination of the untimely claims against Flynn, the remaining parties and the issues being litigated here substantially overlap with those in the Petters-related bankruptcy proceedings.

Given the duplicity of the concurrent federal proceedings, the Court finds that "considerations of wise judicial administration," including "conservation of judicial resources and comprehensive disposition of litigation" warrant abstention. Co. River, 424 U.S. at 817. Judicial resources will be conserved by avoiding having two federal courts simultaneously examining the same facts to resolve the same issues. Abstention will also result in the most

comprehensive disposition of the litigation because it will avoid piecemeal litigation and inconsistent decisions.  Indeed, as more than one court has recognized when considering Petters-related litigation brought by Ritchie, "there exists a real danger that conflicting findings may emerge across the various courts where Ritchie is litigating the fallout of Petters' alleged frauds."  Ritchie Capital Mgm't., Inc. v. U.S. Bank Nat'l Ass'n, No. 14-8513, 2015 WL 1611391, at *6 (S.D.N.Y. Apr. 10, 2015) (quoting Ritchie Capital Mgmt., L.L.C. v. JPMorgan Chase & Co., No. 14-2557, 2014 WL 5810629, at *9  (S.D.N.Y. Nov. 10, 2014)).

Ritchie offers two additional arguments against abstention, both which lack merit.  First, Ritchie contends that abstention was not applied to Palm Beach Trustee's action against BMO in Florida bankruptcy court, even though PCI Trustee's action against BMO involving substantially the same claims was proceeding at the same time in the Minnesota bankruptcy court.  Ritchie thus concludes that abstention should similarly not apply here.  However, abstention was not requested by any party in the Palm Beach Trustee's action and was therefore not considered.

Second, Ritchie argues that abstention is not warranted because the PCI Trustee's lawsuit against BMO is barred.  Ritchie notes that BMO has moved to dismiss the PCI Trustee's lawsuit in bankruptcy court based on standing and in pari delicto grounds.[4]  However, the motion remains undecided in bankruptcy court and no determination has been made on whether the PCI

---

[4] "The doctrine of in pari delicto is the 'principle that a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing.'" Grassmueck v. Am. Shorthorn Ass'n, 402 F.3d 833, 837 (8th Cir. 2005) (quoting Black's Law Dictionary 806 (8th ed. 2004)).  The in pari delicto defense "can bar a claim by a bankruptcy trustee against a third party for pre-petition harm to a debtor when the debtor's agents colluded in the wrongful conduct alleged." In re Senior Cottages of Am., LLC, 482 F.3d 997, 1005 (8th Cir. 2007).  However, there are exceptions to the doctrine and the success of the defense varies depending on the facts of the case. Id.

Trustee has standing and whether the in pari delicto doctrine applies.  Moreover, the issues of the PCI Trustee's standing and ability to sue have the potential to significantly impact the PCI Bankruptcy estate and its many creditors.  Therefore, these issues are more properly decided in the comprehensive context of the collective bankruptcy proceedings rather than in this satellite litigation by Ritchie.

Because the FAC is duplicative of the PCI Bankruptcy proceedings, abstention is appropriate and Ritchie's Motion for Leave to Amend the Complaint is denied based on futility.

### b.  Failure to State a Claim

Based on the Court's determination that the FAC is futile due to abstention, BMO's futility argument under Rule 12(b)(6) will not be addressed here.

## B.  Motion to Dismiss

BMO argues that the original Complaint must be dismissed because it fails to state a claim for relief under Rule 12(b)(6) and, alternatively, because abstention is appropriate.  The original Complaint is substantially similar to the FAC in that it asserts the same causes of action against M&I based on primarily the same conduct.  See Compl. ¶¶ 2–6, 21–96.  For the same reasons as those discussed with regard to the FAC, the Court finds that the original Complaint duplicates the Petters-related bankruptcy proceedings and that abstention is warranted.  Therefore, the case will be dismissed without prejudice until the related PCI Bankruptcy Proceedings (Ritchie's proofs of claim, the Ritchie Adversary Proceeding, and the BMO Adversary Proceeding) have been resolved.[5]

---

[5] Ritchie argues that if the Court concludes that abstention is warranted, this case should be stayed rather than dismissed.  However, Ritchie does not offer support for why a stay would be preferable.

**IV.  CONCLUSION**

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      BMO's Motion to Dismiss [Docket No. 63] is  **GRANTED.**  The case is

dismissed without prejudice until after the related PCI Bankruptcy proceedings

have been resolved; and

2.      Ritchie's Motion for Leave to Amend the Complaint [Docket No. 90] is

**DENIED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  March 15, 2016.

26